**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

United States of America,

        Plaintiff,

                                      Case No.: 1:20-cr-00088

   v.

                                        Judge Michael R. Barrett

Tevaughn Presley,

        Defendant.

## <u>ORDER DENYING MOTION TO SUPPRESS EVIDENCE</u>

This matter is before the Court on Defendant Tevaughn Presley's Motion to Suppress Evidence (Doc. 24), which the United States has opposed (Doc. 25). An evidentiary hearing was held on February 12, 2021, at which two witnesses testified and various exhibits (including police radio transmissions and video pole and body worn camera footage) were presented. (Docs. 26, 27). Post-hearing briefs were filed. (Docs. 30, 32, 33). For the reasons that follow, Defendant's Motion will be DENIED.

## I. FACTS ADDUCED AT THE FEBRUARY 12, 2021 HEARING

Cincinnati Police Officers Kevin Broering and Bryan Delk testified. Broering is assigned to the Gang Unit. (Doc. 27 PAGEID 92 (5:16–23)). Delk is assigned to District Three's Investigative Unit. (*Id.* PAGEID 117 (30:9–15)).

In April 2020, ongoing gang violence was plaguing the Cincinnati neighborhoods of Cumminsville and the Villages of Roll Hill (commonly called "The Fay"). Jerel Gardner and Adonis O'Neal were shot on April 7 in a drive-by shooting in Cumminsville; later that night, Sanchez Lee was killed in The Fay. (*Id.* PAGEID 97 (10:2–21)). Then,

on April 15, David Norwood was killed on Cass Avenue in Cumminsville. (*Id.* PAGEID 97–98 (10:24–11:3)).

The entire Gang Unit was assigned to monitor the April 17 funeral of Sanchez Lee. The officers anticipated retaliatory violence and were looking for suspects in the David Norwood homicide. (*Id.* PAGEID 98–99 (11:4–12:9)). During this surveillance, Officer Broering heard a radio call from officers reporting multiple shots at The Fay at the corner of Faraday Road and President Drive. Witnesses told police[1] that the shots were fired from the backseat of a gold Hyundai sedan (with heavy window tint) that continued down Faraday Road. (*Id.* PAGEID 99–100 (12:20–13:8); 101 (14:3-9); 123–24 (36:25–37:7)). Faraday Road is a narrow two-lane road that connects the two neighborhoods. (*Id.* PAGEID 101 (14:10–17)).

Officer Delk and Police Specialist Gary Turner were assigned to uniform detail work at The Fay on April 17 because of the ongoing gang violence. They were on the "short end" of Williamsburg Drive, off of President Drive, when they heard shots. (*Id.* PAGEID 119–20 (32:14–33:23)). The shots sounded like they came from the entrance of The Fay on President Drive, which Delk communicated over the radio. (*Id.* PAGEID 121 (34:6–12)). Delk reported to the area of the shooting where multiple shell casings (7.62 mm and 9 mm) were found at the corner of Faraday Road and President Drive. (*Id.* PAGEID 124 (37:8–23); 125 (38:17–20)). This information was also communicated over the radio. Specialist Turner reviewed video footage (captured at The Fay) of a gold Hyundai (with heavy window tint) turn from President Drive on to Faraday Road.

---

[1] As it happened, Detective Carl Beebe was present at The Fay talking with management about an unrelated homicide. Witnesses told management about the suspect vehicle, and Beebe reported its description and location over the radio. (Doc. 27 PAGEID 123–24 (36:8–37:9)).

(*Id.* PAGEID 125–26 (38:21–39:8)).  The car in which the shooting victim was located reported the shooting to officers that had responded to an unrelated auto accident. Occupants of that car stated that a gold car was involved in the shooting.[2]  This information, too, was broadcast over the radio.  (*Id.* PAGEID 127 (40:3–20)).

Additional information was relayed over the air by multiple officers.  (*Id.* PAGEID 122–23 (35:9–36:7); 148 (61:3–9)).  Officers found the gold Hyundai parked on Herron Street in Cumminsville across the street from Matthew Merriweather's house, a known associate of David Norwood.  A Volvo SUV was also parked there.  (*Id.* PAGEID 101–02 (14:18–15:14); 146–47 (59:23–60:5)).  Officers observed a male come out of the house and move the gold Hyundai—which officers learned was stolen—farther up Herron Street.  (*Id.* PAGEID 102 (15:17–25)).  Meanwhile, individuals exited the Merriweather house and got into the Volvo.  The male that moved the gold Hyundai then got into the passenger front seat of the Volvo.  (*Id.* PAGEID 103 (16:1–4); 146–47 (59:23–60:15)).  Officers observed spent shell casings on the windshield of the gold Hyundai, which they communicated over the radio.  (*Id.* PAGEID 107–08 (20:13–21:1); 147 (60:18–61:9)).  They matched the shell casings recovered in the area of the drive-by shooting.

Officer Broering, who was in uniform and driving a police cruiser, and having heard all these radio communications, was asked to make a traffic stop.  (*Id.* PAGEID 99 (12:10–13); 103 (16:1–2); 114–15 (27:21–28:4); 145–48 (58:21–61:9)).  Four people were in the car, which was stopped on Spring Grove Avenue just south of Winton Road. Broering recognized Defendant Presley, who he recognized from "several street

---

[2] One of the occupants was Jason Lee, the brother of Sanchez Lee killed at The Fay.  (*Id.* PAGEID 131–32 (44:8–45:3)).

interactions" and knew he was a convicted felon.  (*Id.* PAGEID 103–04 (16:20–17:9); 104–05 (17:18–18:1)).  The male that moved the gold Hyundai was identified as Robert Hunter.  (*Id.* PAGEID 105 (18:5–13)).  The driver was identified as Latonia Harper and the back-seat passenger seated next to Defendant was identified as Olufemi Thompson.  (*Id.* PAGEID 105 (18:5–24); 113 (26:14–19)).

When Officer Broering approached the Volvo SUV, Thompson stated that he had a concealed carry weapon ("CCW") permit and had a firearm in his possession, which police recovered.  (*Id.* PAGEID 105–06 (18:25–19:7)).  The three male occupants were removed from the vehicle, patted down, and handcuffed.  Hunter had concealed keys to the stolen gold Hyundai in his groin area.  (*Id.* PAGEID 106–07 (19:19–20:12); 114 (27:2–9)).  When Broering searched the vehicle, he found a loose round of ammunition in the center console and an extended magazine in the glove box.  (*Id.* PAGEID 108–09 (21:2–22:3)).  He also recovered cell phones from both the front and back seats, including Defendant's iPhone. (*Id.* PAGEID 109–10 (22:4–23:1)).

The four individuals were separately transported to District Three in connection with the shooting at The Fay.  Officer Broering transported Robert Hunter, who stated during the ride that he knew Jerel Gardner, the April 7 shooting victim.  (*Id.* PAGEID 110 (23:2–19)).  Upon arrival, all four were swabbed for gunshot residue.  (*Id.* PAGEID 128 (41:3–11)).  Broering turned over the cell phones to the detectives that would be handling the shooting investigation, Officer Delk and Specialist Turner.  (*Id.* PAGEID 111 (24:6–14); 120 (33:6–10); 130 (43:8–12)).

Delk had returned to District Three approximately an hour after the shooting to interview the occupants of the Volvo SUV.  (*Id.* PAGEID 126–27 (39:14–40:2)).

4

Defendant immediately invoked his right to counsel and his interview ended. Delk found the other three occupants not "forthcoming" with information as to their involvement in the shooting. (*Id.* PAGEID 129–30 (42:3–43:2); 136–37 (49:10–50:4)). Defendant was released, along with Latonia Harper and Olufemi Thompson. Robert Hunter was charged with receiving stolen property (the gold Hyundai). (*Id.* PAGEID 130–31 (43:21–44:7)).

Officer Delk wrote up a search warrant for each phone, including Defendant's, early the next week. (*Id.* PAGEID 130 (43:13–20)). During the search of Defendant's iPhone, officers located a photograph of a gun and were able to identify the serial number. (Doc. 24 PAGEID 63). On August 26, 2020, Defendant was indicted on a single count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). The charge is based on the photograph alone, as the firearm itself was never located. (Doc. 24 PAGEID 63; Doc. 25 PAGEID 74).

## II. ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons, . . . and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.

Defendant makes three arguments. First, officers lacked probable cause to seize his iPhone from the Volvo SUV. Second, officers lacked probable cause to arrest and search (gunshot residue swab) him. Third, the warrant authorizing search of his iPhone lacked probable cause and a nexus. (Doc. 30 PAGEID 157).

### A.  There Was Probable Cause to Seize Defendant's iPhone

Defendant does not challenge the search of the Volvo SUV *per se*.  (*Id.* PAGEID 160 n.2; Doc. 33 PAGEID 181 ("To be clear, the defense has not and does not challenge the search of the Volvo.")).  Rather, he contends that the police lacked probable cause to seize his iPhone during that search because the traffic stop was initiated *only* because front-seat passenger Robert Hunter was suspected of involvement with the gold Hyundai drive-by shooting.  Not knowing that Defendant was in the Volvo before the stop was made, police had no reason to believe that Defendant, or his property, was involved in criminal activity.  (*Id.* PAGEID 160–61).

Although exempt from the warrant requirement of the Fourth Amendment, "a demonstration of probable cause is nevertheless required" to justify a vehicle search. *United States v. Padro*, 52 F. 3d 120, 122 (6th Cir. 1995).  "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'"  *Id.* at 122–23 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  "The test for probable cause is simply whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at 123 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "Determinations of probable cause are based on a review of the 'totality-of-the-circumstances,' and involve a practical, common sense review of the facts available to the officer at the time of the search."  *Id.* (citing *Gates*, 462 U.S. at 230)).

There is no question that police had probable cause to support a *Terry*[3] stop of the Volvo.  There is also no question that police had probable cause to seize Defendant's iPhone.

Officers were aware of a drive-by shooting with a back-seat shooter.  A suspect vehicle, a gold Hyundai, had been identified.  Officers quickly located a gold Hyundai parked across the street from Matthew Merriweather's house, a known associate of David Norwood who had been killed two days earlier.  Robert Hunter came out of the Merriweather house, got into the gold Hyundai—which officers learned was stolen—and moved it farther away from the house.  Three other individuals came out of the Merriweather house and got into a Volvo SUV.  This crew immediately picked up Hunter after he moved the gold Hyundai.  Having all been inside the Merriweather house, all plausibly had a connection to gang-related activity.

Two different caliber shell casings were found on the windshield of the gold Hyundai, suggesting the possibility of two shooters.  These shell casings matched the shell casings recovered from the flight path of the vehicle involved in the shooting. When Officer Broering stopped the Volvo, the backseat passenger next to Defendant stated that he had a CCW permit and was carrying a firearm.  That firearm was recovered along with a loose round of ammunition and an extended magazine (for different firearms), both hidden.  The keys to the gold Hyundai were recovered from Hunter, also hidden.

Broering specifically recognized Defendant from "several street interactions."  He seized cell phones from all four occupants, knowing from experience that evidence of

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

violent crimes often are contained on a suspect's cell phone.  (Doc. 27 PAGEID 96 (9:10–24)).  Under the totality of these circumstances, it was reasonable to suspect not only Robert Hunter, but also Latonia Harper, Olufemi Thompson, and Defendant Presley.  Reports of a back-seat shooter and Defendant's presence both inside the Merriweather house and inside the Volvo that immediately picked up Hunter after he moved the suspect vehicle are particularly compelling facts in determining that there was a "fair probability" that evidence of a crime would be found on Defendant's cell phone.

It is true that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."  *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (citing *Sibron v. New York*, 329 U.S. 40, 62–63 (1968)).  As discussed, however, there is much "more" supporting the seizure here.  (*Cf.* Doc. 27 PAGEID 145–46 (58:18–59:11) *with* Doc. 27 PAGEID 146–49 (59:12–61:9)).  Probable cause "is not a high bar," *see Kaley v. United States*, 571 U.S. 350, 338 (2014), and it clearly has been met here.  The seizure of Defendant's cell phone was lawful.

### B.  There Was Probable Cause to Detain and Search Defendant

Defendant argues that his detention at District Three amounted to an arrest for Fourth Amendment purposes.  (Doc. 30 PAGEID 161–63).  The United States does not concede this fact.  (Doc. 32 PAGEID 175).  Nonetheless, it contends—arrest or not— that Defendant's detention was lawful because officers had probable cause to believe that he had committed a crime.  (*Id.* PAGEID 175–77).

8

Defendant correctly observes that "the facts used by the officers to support the seizure of [his] phone were the same facts they relied upon to transport him to the district for questioning."  (Doc. 30 PAGEID 162).  For the same reasons the Court finds that there was probable cause to seize Defendant's iPhone, the Court likewise finds that there was probable cause to detain Defendant.  Accordingly, and to the extent relevant at trial, the search of his person (gunshot residue swab) will not be suppressed as the "fruit of the poisonous tree" pursuant to *Wong Sun v. United States*, 371 U.S. 47 (1963).

### C. Probable Cause Supports the Warrant Authorizing the Search of Defendant's iPhone

In determining whether a search warrant is supported by probable cause, a court may consider only the "four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971)).  Thus, "information known to the officer but not conveyed to the magistrate is irrelevant."  *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citation omitted)). An affidavit must show a "likelihood of two things" to establish probable cause for a search.  *Id.* (internal quotations and citations omitted).  They are: "first, that the items sought are seizable by virtue of being connected with criminal activity; and second, that the items will be found in the place to be searched."  *Id.* (citing *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 n.6 (1978))) (internal quotations omitted).  "[E]vidence of a crime" is a critical component

of a search warrant. *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) (citing *Zurcher*).[4]

As previously explained, probable cause exists when "common-sense" suggests a "fair probability" that contraband or evidence of a crime "will be found in a particular place." *Gates*, 462 U.S. at 238. "[T]he affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). "The connection between the [property] and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *Id.* (quoting *Carpenter*, 360 F.3d at 595).

Defendant argues that, because the initial seizure of his cell phone was not supported by probable cause, the police had no basis to retain his iPhone (after his release) and later search it. (Doc. 33 PAGEID 185). He also contends that there is no showing within the Delk affidavit that evidence of the alleged crime would be found on his iPhone. (*Id.* PAGEID 185–86).

These facts are found within the four corners of the Delk affidavit:

(1)   affiant was investigating a felonious assault offense that occurred on April 17, 2020;

(2)   officers heard "several gunshots" coming from The Fay complex;

(3)   the Emergency Communications Center began receiving calls for "multiple shots" fired in the area;

(4)   occupants in a Chevrolet Impala advised officers that they were shot at by "occupants in a gold vehicle, possibly a Hyundai, with heavy window tint;"

---

[4] To this end, an applicant for a search warrant must recite the statutory violation for which the warrant is requested on the face of the warrant or in the affidavit in support. *See United States v. Abboud*, 438 F.3d 554, 569–71 (6th Cir. 2006).

(5)    video surveillance from The Fay captured a gold Hyundai Sonata with heavy window tint leaving the area of the offense shortly after shots were heard by the officers nearby;

(6)    officers recovered two different kinds of shell casings (7.62 mm and 9 mm) at the crime scene;

(7)    "[s]oon after the offense" the gold Hyundai Sonata was observed parked on Herron Avenue;

(8)    the driver of the gold Hyundai Sonata exited the Sonata and entered a bronze colored Volvo and left the area;

(9)    officers stopped the Volvo and recovered a firearm and a thirty-round magazine from the vehicle;

(10)    officers also recovered from Robert Hunter the keys to the suspect vehicle, the gold Hyundai Sonata;

(11)    officers processed the gold Hyundai Sonata parked on Herron Avenue and recovered both a 7.62 mm and a 9 mm from the vehicle, matching the caliber of ammunition recovered from the suspect vehicle's path of flight from the crime scene;

(12)    the four occupants of the Volvo, Defendant included, "were not being forthcoming regarding their involvement and/or knowledge of the offense or facts surrounding the offense;"

(13)    affiant's training and experience tells him that co-conspirators in criminal activities use cellular devices to communicate and that these cellular devices contain evidence of crimes (*e.g.*, location information, witnesses);

(14)    affiant has used cellular communications data obtained from similar types of warrants to assist in previous investigations and prosecutions; and

(15)    affiant believes that Defendant may have been in possession of his iPhone at the time the shootings occurred and may have used it to communicate with the other three occupants of the Volvo.

(Doc. 24-1 PAGEID 70–71).

The Court will disregard Officer Delk's statement that Defendant was not forthcoming when questioned back at the district.  At the February 12 hearing, Delk recanted this statement because he clarified that Defendant's interview ended immediately because Defendant invoked his right to counsel.  (Doc. 27 PAGEID 136 (49:10–23)).  Even without this statement, however, under a totality-of-circumstances review, the affidavit sufficiently links Defendant (as well as the other two Volvo occupants, Latonia Harper and Olufemi Thompson) to the gold Hyundai Sonata. Officers themselves heard multiple shots.  Citizens reported multiple shots to police. The occupants of the Chevrolet Impala stated they were shot at by occupants, plural, in a gold Hyundai Sonata.  Two different kinds of shell casings were found at the crime scene.  The suspect vehicle, the gold Hyundai Sonata, was promptly located.  The same size shell casings that were found at the crime scene were found when the suspect vehicle was processed.  Defendant was a passenger in the Volvo that immediately picked up the driver of the suspect vehicle.  A search of the Volvo quickly followed, during which ammunition was found.  As well as Defendant's iPhone.  Harper, Hunter, and Thompson were not "forthcoming" in their interviews.  Finally, Officer Delk has experience in investigating criminal activity conspiracies and knows that co-conspirators communicate using their cell phones, which can provide location information data and identify potential witnesses.

As noted, probable cause "is not a high bar."  *Kaley*, 571 U.S. at 338.  "It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act."  *Id.* (citing *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quoting *Gates*, 462 U.S. at 231, 238)) (internal quotations omitted) (alteration in original).  A

reviewing court should give "great deference" to a magistrate judge's probable cause determination and reverse only if it was "arbitrarily" made. *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009). The Court finds no basis to conclude that the Hamilton County Judge that signed the search warrant acted without reason.

Defendant accurately points out that Officer Delk failed to include in his affidavit details about the possibility of retaliatory gang violence and Defendant's presence at the Merriweather house. (Doc. 33 PAGEID 181–82). But the Court should not engage in "line-by-line scrutiny of the warrant application's affidavit." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). The affidavit should be judged "on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

### D. Good-Faith Exception to the Exclusionary Rule Would Apply

Had the opposite conclusion prevailed, the Court determines that the *Leon* good-faith exception to the exclusionary rule nevertheless would apply.

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). But courts typically should not suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). The four specific situations in which an officer's reliance cannot be considered "objectively reasonable" are: (1) when the warrant is issued on the basis of an affidavit that an affiant knows—or is reckless in not knowing—contains false information; (2) when the issuing magistrate abandons his or her neutral and detached

13

role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.  *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*).

   "An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a 'bare bones' affidavit." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citing *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)).  A bare bones affidavit is one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge."  *Id.* (quoting *Laughton*, 409 F.3d at 748 (quoting *Weaver,* 99 F.3d at 1378)).  Yet if the reviewing court can identify "**some** connection, regardless of how remote it may have been"— "some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and reliance on it is reasonable.  *Id.* at 497 (quoting *Laughton*, 490 F.3d at 749–50) (emphasis in original). Further, a bare bones affidavit should not be confused with one that lacks probable cause, and the distinction is not one of semantics.  *Id.*  "There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function."  *Id.*  Thus, "[t]he question is not whether [the reviewing court] would have found probable cause."  *United States v. Asgari*, 918 F.3d 509, 513 (6th Cir. 2019).  "It is whether the affidavit was so skimpy, so

conclusory, that anyone looking at the warrant would necessarily have known it failed to demonstrate probable cause." *Id.*

Applying this standard, the Delk affidavit is not a bare bones affidavit.  Reports of hearing multiple shots, witnesses to the shooting saying they were shot at by more than one of the occupants in the suspect vehicle, recovery of identical caliber shell casings at the crime scene and from the suspect vehicle, and Defendant's presence in the Volvo that picked up the driver of the suspect vehicle in the aftermath of the shooting together provide "**some** connection" to Defendant and, in turn, to his iPhone. *White*, 874 F.3d at 497 (quoting *Laughton*, 490 F.3d at 749–50) (emphasis in original).

In the alternative, therefore, *Leon*'s good-faith exception applies and saves the search of Defendant's iPhone.

### III.    CONCLUSION

Based on the foregoing reasons, Defendant Tevaughn Presley's Motion to Suppress Evidence (Doc. 24) is hereby **DENIED**.

**IT IS SO ORDERED**.

/s/ *Michael R. Barrett*
JUDGE MICHAEL R. BARRETT